ROTHWELL FIGG ERNST & MANBECK, P.C.
Christopher Ott (CA Bar No. 235659)
cott@rothwellfigg.com
16501 Los Barbos
Rancho Santa Fe, CA 92067
(202) 783-6040

Leo M. Loughlin (pro hac vice to be filed)
(DC Bar No. 474963)
(lloughlin@rfem.com)
Daniel McCallum (pro hac vice to be filed)
(DC Bar No. 1006938)
(dmccallum@rfem.com)
Jennifer Maisel (pro hac vice to be filed)
(DC Bar No. 1025637)
(jmaisel@rfem.com)
Caitlin M. Wilmot (pro hac vice to be filed)
(DC Bar No. 241246)
(cwilmot@rfem.com)
Dylan Haversack (pro hac vice to be filed)
(VA Bar No. 95814)
(dhaversack@rfem.com)

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COORDINATION TECHNOLOGY LTD., Derivatively on Behalf of Nominal Defendant, CASPERLABS LLC, | **VERIFIED SHAREHOLDER DIRECT AND DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES.** |
| Plaintiff, | **DEMAND FOR A JURY TRIAL** |
| v. | |
| BROCK PIERCE, | **'21 CV 1295 LAB AHG** |
| SCOTT WALKER, | |
| MRINAL MANOHAR, | |
| MEDHA PARLIKAR, | |
| CLIFFORD SARKIN, | |

VARUN GUPTA,

TERREN PEIZER,

JACK LYNCH,

JOSEPH RICHARD MURRAY,

DANIEL MARFURT,

MATTI TAPANI LIUKAS,

RALPF KUBLI,

PATRICK STORCHENEGGER,

SEAN INGGS,

CHRISTOPHER BOWRING,

                    Defendants.


And

CASPERLABS LLC,
                    Nominal
                    Defendant

Plaintiff Coordination Technology Ltd. ("CoorTech" or "Plaintiff"), by and through the undersigned counsel, files this Verified Shareholder Direct and Derivative Complaint and Demand for Jury Trial against Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring (collectively, "Defendants"), and hereby alleges as follows:

## NATURE OF THE ACTION

1.      The Defendants violated their fiduciary responsibilities to shareholders to maximize their personal gain, including, but not limited to, schemes to get to market by sacrificing the advertised technology (such as by failing to meet the

standards of performance emphasized in the original CBC Casper paper[1]), looting from the company's investment funds, misleading the investing public, and violating securities laws. In this case, the Defendants have crossed the line from legitimate business and into fraud and abuse. As a shareholder of the relevant company, CoorTech has the standing and responsibility to take legal action against fiduciaries who act against the interests and corporate mandates of CasperLabs for their private economic benefit.

2.     Plaintiff CoorTech is a Saint Lucia corporation that Vlad Zamfir founded for the express purpose of promoting and protecting blockchain technologies.

3.     Mr. Zamfir is a prominent researcher in the blockchain community and developed a seminal correct-by-construction ("CBC") proof-of-stake ("PoS") blockchain consensus protocol.  Mr. Zamfir is the "Face of Casper." *See* Ex. 1.

4.     At all times relevant to this action, CoorTech owned shares of CasperLabs Holdings AG and its predecessor entity Adaptive Holdings. CasperLabs Holdings AG is the sole member of a CasperLabs LLC, which is a Wyoming limited liability corporation with its principal place of business in San Diego, California. Under Wyoming corporate law, CasperLabs' officers and directors, which include the Defendants, owe fiduciary duties to the shareholders. Consistent with the definition in paragraphs 11 and 12 *infra*, "CasperLabs" refers to multiple entities that share the same controlling persons.

5.     In this civil action, executives, the controlling shareholder, and board members of CasperLabs have utilized lies and fraud in an attempt to hijack the potentially world-changing CBC Casper technology in order to line their own pockets. Their cynical and corrupt acts give rise to direct and shareholder derivative claims for breach of the fiduciary duties of due care and loyalty, which are

---

[1] This paper can be found at https://github.com/cbc-casper/cbc-casper-paper.

guaranteed under Title 17 - Corporations, Partnerships and Associations, Chapter 29 - Wyoming Limited Liability Company Act, Article 4 - Relations Of Members To Each Other And To The Limited Liability Company, Section 17-29-409. Defendants violated those fiduciary duties by making false and misleading statements to the public about implementing the "Casper" technology, when, in fact, they pursued short-term financial gain by giving up on basic and critical design requirements that have always been emphasized in Casper research and development. These false and misleading statements included: (1) Mr. Zamfir's involvement in the CasperLabs LLC technology; (2) their faithful implementation of the CBC Casper protocols and technology; and (3) the association of the "Casper" name with their technology and token.

6.     Defendants further violated their fiduciary duties by engaging in a series of schemes designed to loot money from the company and defraud the investing public.  These schemes include: (1) approving the acquisition of Alchemist Accelerator LLC stock for more than $2 million despite knowing that the transaction was merely a way to funnel more investment money directly to Defendant Scott Walker; (2) mismanaging the "Casper network" development to result in an substandard product and maximize their short-term personal gains at the expense of the company's long-term health; (3) that in or about May 2021, the Defendants engaged in a coordinated promotion and sell-off of "Casper" coins, among themselves and others acting at their direction, without notice to other CasperLabs LLC shareholders and securities holders, a fraudulent act that violated Securities and Exchange Commission rules (under the authority granted by the Securities Exchange Act of 1934) and the federal fraud statutes; and (4) beginning in or about May 2021, the Defendants knowingly participated in a fraudulent scheme to artificially inflate and maintain the price of the CasperLabs coins to maintain undisclosed profits earned by participating exchanges, a fraudulent scheme that violated Securities and

Exchange Commission rules (under the authority granted by the Securities Exchange Act of 1934) and the federal fraud statutes.

7.     Plaintiff's derivative and direct fiduciary duty claims are based on Defendants' damage to the company due to the false statements to the public, for the derivative claims, and CoorTech directly.

8.     Plaintiff seeks monetary and injunctive relief.

## THE PARTIES

9.     Plaintiff CoorTech is a Saint Lucia corporation that Vlad Zamfir founded in for the express purpose of researching, developing, promoting and protecting blockchain technologies.

10.     Upon information and belief, CasperLabs LLC was incorporated under the laws of Wyoming in or about October 2018, and has a principal place of business at 11440 West Bernardo Court, Suite 300, San Diego, CA 92127.

11.     CasperLabs LLC was first a wholly-owned subsidiary of Adaptive Holdings Ltd., a Cayman Islands entity. In or about June 2020, Defendant Mrinal Manohar informed all shareholders, including CoorTech, that "Adaptive Holdings Ltd., a Cayman Islands exempted company [had added] a newly formed company, CasperLabs Holdings AG, a Swiss company, as the top-level entity of Adaptive's corporate group of companies." All Adaptive Holdings shares, including CoorTech's, changed over into CasperLabs Holdings AG shares in or about September 2020.

12.     CasperLabs Holdings AG, Adaptive Holdings Ltd.[2], and CasperLabs LLC (collectively, "CasperLabs"): (1) use their names interchangeably; (2) share identical officers; (3) share identical boards; (4) share an accountant; (5) share bank accounts; (6) share a website, where they refer to each other interchangeably; and (7) no CasperLab entity holds Board meetings in Switzerland, Wyoming, or the Cayman

---

[2] According to Cayman Islands records, Adaptive Holdings Ltd. voluntarily dissolved in 2021.

Islands.  The Defendants controlled Swiss and Cayman Island entities from the United States. During the times relevant to this action, CoorTech owned between 4% and 14% of CasperLabs' stock, depending on the level of dilution at the time.

13.     Brock Pierce is an infamous blockchain investor. Mr. Pierce resides in Puerto Rico. Mr. Pierce's longtime business partner is Defendant Scott Walker. Beginning in or about June 2019, Mr. Pierce, through his own shares and proxy rights that he had acquired, was the controlling shareholder of CasperLabs.  In or about January 2020, Mr. Pierce informed Vlad Zamfir that he conceived of the idea for and name of "CasperLabs."

14.     Scott Walker is a Director and Co-founder at CasperLabs. Mr. Walker resides in Puerto Rico and Palm Desert, California. Scott Walker's longtime business partner is Defendant Brock Pierce.

15.     Defendant Mrinal Manohar is the CEO, acts as an Executive Director, and is the co-founder of CasperLabs. Mr. Manohar works at 114401 W. Bernardo Ct, Ste 300, San Diego, California, 92127 and resides in New York.

16.     Medha Parlikar is the Chief Technology Officer and co-founder of CasperLabs. Mrs. Parlikar primarily works at 11440 W. Bernardo Ct, Ste. 300, San Diego, California, 92127 and resides in San Diego County, California.

17.     Clifford Sarkin is the Chief Operating Officer of CasperLabs and has been since approximately November 2019. Mr. Sarkin primarily works at 11440 W. Bernardo Ct, Ste. 300, San Diego, California, 92127 and resides in San Diego County, California.

18.     Varun Gupta is the General Counsel of CasperLabs. Mr. Gupta primarily works and resides in San Francisco, California.

19.     Terren Peizer is a Director and board member of CasperLabs. Mr. Peizer lives and works in Los Angeles, California.

20.     Jack Lynch was the Chief Operating Officer of CasperLabs from approximately May 2019 until November 2019. Mr. Lynch lives in Texas.

21.     Daniel von Emmen Marfurt is the Chief Financial Officer at CasperLabs. Mr. Marfurt works at 11440 W. Bernardo Ct, Ste 300, San Diego, California, 92127.  Mr. Marfurt resides in San Diego, California and Zug, Switzerland.

22.     Bernd Lapp was the Chief Financial Officer at CasperLabs, prior to Mr. Marfut. Mr. Lapp works and resides in Switzerland.

23.     Mr. Joseph Richard Murray was the Financial Controller at CasperLabs. Mr. Murray works and lives in New York City.

24.     Sean Inggs was a Director of Adaptive Holding Ltd., the predecessor company of CasperLabs Holdings AG. Mr. Inggs works and lives in the Cayman Islands.

25.     Christopher Bowring was a Director of Adaptive Holding Ltd., the predecessor company of CasperLabs Holdings AG. Mr. Bowring works and lives in the Cayman Islands.

26.     Matti Tapani Liukas is a Director and board member of CasperLabs. Mr. Liukas lives and works in Switzerland.

27.     Ralf Kubli is a Director and board member of CasperLabs. Mr. Kubli lives and works in Zurich, Switzerland.

28.     Patrick Storchenegger is a Director and board member of CasperLabs. Mr. Storchenegger lives and works in Switzerland.

29.     Defendants Manohar, Gupta, Parlikar, Sarkin, Lynch, Murray, and Marfurt are collectively referred to as the "Executive Defendants" in this complaint. They were executives at CasperLabs LLC, CasperLabs AG, and Adaptive Holdings Ltd. during the relevant dates.

30.     Defendants Walker, Manohar, Peizer, Sean Inggs, and Christopher Bowring, served together on the Adaptive Holdings Ltd and CasperLabs LLC boards in 2019. They are collectively referred to as "the Cayman Board Defendants" in this complaint.

31.    Defendants Manohar, Walker, Peizer, Liukas, Kubli, and Storchenegger served together on the CasperLabs Networks AG board starting in 2019. These defendants are collectively referred to as "Swiss Board Defendants" in this complaint.

**JURISDICTION AND VENUE**

32.    This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332. CoorTech, a Saint Lucia corporation, is diverse from all of the Defendants.

33.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) in that multiple Defendants reside in this district and most of the facts alleged in this complaint involve this district. Also, *Zamfir v. Casperlabs, LLC*, 21-cv-00474-TWR-AHG, is already filed in this court and shares many of the parties and most of the same operative facts.

34.    On information and belief, Defendants are subject to personal jurisdiction in this district by virtue of working as officers and directors for a company that is physically present in this State, having its principal place of business in this judicial district, having conducted business in this State, having availed itself of the rights and benefits of California laws such that it should reasonably anticipate being hauled into court in this judicial district, having engaged in systematic and continuous contacts with the State of California, and in particular within this judicial district, and from the receipt of substantial revenue from activities conducted in this state and in this judicial district. In addition, upon information and belief Defendants Varun Gupta, Clifford Sarkin, Medha Parlikar, Daniel Marfurt, and Terren Peizer reside in California.  Defendants Clifford Sarkin, and Medha Parlikar reside in this district.

**FACTS**

**A. Blockchain Background**

35.    A blockchain is a verifiable transactional sequencing and record keeping system composed of the transaction itself and a cryptographic fingerprint, or hash, of the transaction combined with its previous transaction (along with other

information). Multiple transactions are then packaged together into a block which also records a fingerprint of the block combined with the previous block (along with some other information). Once a transaction or block is created, it cannot be altered retroactively without leaving evidence of the alteration in the hash chain.

36.     In a Proof of Work system ("PoW"), the miner validating the transactions and creating the block must solve a computationally intensive puzzle to show that they are devoting a lot of expensive computational power. Although wasteful, this helps to protect the network from miner's malicious behavior which may compromise the trustworthiness of the network's record keeping.

37.     The block is then transmitted to other miners on the network for verification. For these subsequent miners, the cost of verifying the transactions and block puzzle is significantly less than the cost to the initial miner of solving the puzzle. This cost asymmetry makes it possible to have multiple copies of the database and blockchain, also known as the distributed ledger, on thousands of machines around the world. Having multiple copies of the same database and hash chain, a synchronous system, ensures no malicious activity and – thus – creates a secure set of records.

38.     In exchange for processing the transaction and creating the block, the miner who solved the computational puzzle is compensated for their work with fees paid by the transactors and a mining reward, a certain amount of new currency, minted by the system itself. However, these payments only occur if the other miners agree with the work done.

39.     An alternative to PoW is Proof of Stake ("PoS"). PoS has been under research in the blockchain and cryptocurrency industry for over five years. Its promise is to eliminate the computational puzzle used by PoW, and its concomitant energy usage, by replacing it with economic resources, funds staked by currency holders. In PoS, the miners are replaced by validators who share a portion of their

validator rewards with the stakers to compensate them for the risk they assume by staking their funds to guarantee the work done by the validators.

**B. Blockchain Business Models**

40. Closed, or permissioned, blockchains address the "Cost of Verification" through centralized administration of permissions to make blocks and/or transactions. These close networks are often controlled by a central authority who can resolve any disputes over the sequencing of transactions.

41. Open, or permissionless, blockchains allow for anyone to sequence transactions by producing blocks. These open blockchains delegate to the software the running of the system so that there is no single entity who owns or administers the network.

42. Truly decentralized systems that are much more valuable by virtue of not being administered by a single legal entity[3]. Moreover, because open networks lack a central authority, they require decentralized governance to coordinate bug fixes, improvements, and upgrades to the software for the community.

43. In open networks, because multiple stakeholders federate around the name of the network, the brand – the name with which the community identifies – is one of the most important objects of blockchain governance.

44. The proven business models and required governance postures for the production of open and permissioned blockchains are very different. However, the Defendants were committed to no business model other than their personal enrichment. Instead, the Defendants tried to tell everyone what they wanted to hear, changing their promises and stories solely in order to enrich themselves personally. To this end, Defendants hijacked the "Casper" name and Mr. Zamfir's likeness when misrepresenting the products and services they fraudulently offer under that mark. The purpose of stealing the brand name and Mr. Zamfir's likeness

---

[3] Fully closed blockchain networks generally do not use coins.

was to trick investors and the public into thinking that Defendants investing in a transformative iteration of a PoS blockchain technology when, in fact, they were solely interested in their short term benefit at the expense of the company and public. For example, the Defendants advertised partnerships and products that are not faithful to basic and critical requirements that have always been emphasized in Casper research. On the basis of these misrepresentations about the technology and Mr. Zamfir's involvements, the Defendants proceeded to use CasperLabs as a vehicle for: raising investment funds based on false representations of their association with Vlad Zamfir and their intention to faithfully implement pre-existing Casper research; looting investment funds; pumping and dumping the "Casper" coins and tokens; and engaging in market manipulation of CSPR coins prices and values.

## C. Mr. Zamfir's Development of Casper

45.     One of the biggest challenges to public, permissionless blockchains, like Bitcoin, is their ability to scale. As the network seeks to increase the number of transactions, what was once one chain, with one transaction history, can easily branch off into multiple side chains. This reduces the security of the network as each miner can develop its own transaction history. The ability for the network to maintain a consistent history throughout is commonly referred to as the "fork choice rule."

46.     In 2014, Mr. Zamfir, an Ethereum Researcher, alongside Vitalik Buterin, the co-founder of Ethereum, and others, began researching and developing a new PoS blockchain protocol that endeavored, inter alia, to address scalability problems.

47.     On August 1, 2015, Mr. Zamfir, building upon the work of Yonatan Sompolinsky and Aviv Zohar's G.H.O.S.T protocol/fork choice rule, published a post on the Ethereum Foundation blog titled "Introducing Casper 'the Friendly Ghost.'" Ex. 2.  The blog post states that "Casper is a security-deposit based economic consensus protocol," and notifies readers that they "can look forward to seeing

simulations, informal and formal specification, formal verifications, and implementations of Casper!"  *Id*.

48.     Although Messrs. Zamfir and Buterin started from the same place, their research soon led them in different directions. Mr. Zamfir's branch of this research became known as "CBC Casper," which refers to correct-by-construction ("CBC") software design methodology.  The branch of research conducted by Mr. Buterin became known as "Casper the Friendly Finality Gadget" ("FFG").  Messrs. Zamfir and Buterin have been jointly conducting this research since 2015 in connection with the much-anticipated, and much-publicized slated release of the Casper PoS protocol for the Ethereum protocol mainnet.  Mr. Buterin's branch of Casper research is now marketed under the name "Ethereum 2.0."[4]  Mr. Zamfir's branch, CBC Casper, is currently known and referred to throughout the industry and consuming public as "Casper."

### D. Mr. Zamfir's Development of the CBC Casper Protocol Draws the Defendants' Attention

49.     In software development, most techniques build upon incremental improvements and extensive testing before deploying new software. However, Correct by Construction "CBC" constitutes a software development methodology that is based on formal verification through mathematical proofs before and after the development phase. Based on some use cases, CBC software development can be significantly more safe and efficient than incremental methodologies such as Agile and DevOps. Using CBC infrastructure, developers can iterate on code much faster and with fewer bugs than any generally used methodology used today. Mr. Zamfir applied a CBC methodology to his research on distributed systems in PoS, which became CBC Casper.

---

[4] This also incorporates the fork choice rule ("LMD GHOST") which was first published in the CBC Casper paper that CasperLabs cites as the start of their company's history.

50.     Realizing the significance CBC Casper could have on the evolution of the industry, in the autumn of 2018, after the yearly Ethereum developer conference, Devcon IV (October 30 - November 2), the Executive Defendants and Cayman Board Defendants approached Mr. Zamfir about collaborating on a new blockchain that they falsely stated would fulfill CBC Casper's promise.

51.     As part of this proposed collaboration, Executive Defendants, Brock Pierce, and Cayman Board Defendants offered to CoorTech that Mr. Zamfir would have two roles collaborating with CasperLabs: (1) as lead consensus protocol architect, from which role Mr. Zamfir would be able to steer the research and development of Casper, and (2) to serve on the governance committee to help inform and shape CasperLabs' open, permissionless, blockchain governance system. As stated above, a blockchain governance system is important to the success of modern open and permissionless networks.  In return for his fulfillment of these roles and duties, CasperLabs contracted to financially support, as a sponsor, Mr. Zamfir's blockchain research on Casper. Despite this agreement, as discussed further below, the Defendants always intended to hijack the Casper name to falsely present to the public that they were fully developing CBC Casper technology when, in fact, they placed their personal short term gains above the health of the company and the company's nominal goal of taking CBC Casper research to fruition.

52.     On or about February 14, 2019, CoorTech also purchased shares of CasperLabs Holdings AG (then known as Adaptive Holdings Ltd)  Beginning on or about February 14, 2019 and continuing to the present, CoorTech owned between 4% and 14% of CasperLabs AG's stock, depending on the level of dilution by CasperLabs at the time. CoorTech's shares in CasperLabs have never been sold or otherwise converted.

**E.  The Defendants Demonstrate Their Disregard for the Underlying Technology Through Their Fraudulent Statements, Bad Faith Negotiations, and Disregard of the Research Agreement**

53.    On or about February 14, 2019, CoorTech entered into a Research Agreement with CasperLabs, setting forth specific terms by which Mr. Zamfir – "a highly recognized thought leader in the world-wide blockchain community with an expertise in blockchain consensus protocols, sharding and governance" – would provide research, analysis, and advice relating to CasperLabs' integration of CBC Casper into its proposed blockchain as well as its approach to blockchain governance.

54.    The Research Agreement first called for the parties to agree on a roadmap to coordinate the work being done between CasperLabs and CoorTech. Defendant Brock Pierce, Defendant Scott Walker, and the Executive Defendants failed to ever complete this roadmap. Instead, the Defendants and CoorTech clashed as to the proper path of the project from the beginning. Instead of developing the promised efficient and scalable technology, the Defendants chose "Plan B" described below.

55.    For example, to unlock its full functionality and the advantages of the CBC Casper PoS protocol it was necessary to address the challenges posed by "liveness," a technical issue that Mr. Zamfir planned on tackling at the end. "Liveness" is the certainty that all transactions sent to the network are "eventually" processed. In April 2019, CoorTech agreed on a two-pronged strategy with CasperLabs, in which Vlad would work on a liveness proof and Dr. Daniel Kane would work on a separate liveness proof, which CasperLabs called "Plan B." Eventually, due to this two-pronged strategy, more than one liveness proof was delivered. CasperLabs paid CoorTech a bounty for Mr. Zamfir's proof. Consistent with these agreements, Mr. Zamfir's approach to liveness would be the one to go forward and Dr. Kane's would be "Plan B."  Instead, the Defendants prioritized low cost over the viability of the underlying technology. They did this although

CoorTech informed them that the overhead was too high and that Dr. Kane's approach would fail to meet the standards of performance emphasized in the original CBC Casper paper.

56.    Over the summer of 2019, Defendant Parlikar stated to CoorTech's representative that she would rather implement Dr. Kane's liveness proof, which only cost $3,000. In these conversations, the cost was the issue, not the value of the respective liveness proof.

57.    This is but one example of Defendants' approach toward the CBC Casper project, which prioritized short term costs and their personal gain over delivering a viable and transformative product[5]. Based upon this false and misleading approach, CoorTech eventually sent notice to the Defendants, on September 11, 2019, terminating the Research Agreement. The parties later agreed to extend the Research Agreement until November 2, 2019, to buy time for a negotiation and clarification of terms. The continued negotiations ultimately failed.

58.    During the autumn 2019, many discussions took place between the parties with CasperLabs' board committing the company to Mr. Zamfir's vision for Casper. However, on October 31, 2019, CasperLabs released a protocol specification that extends their version of CBC Casper with the Dr. Kane module for "liveness." However, "Plan B" has too high a network overhead. By implementing "Plan B", the Defendants delivered a minimum viable product that could not deliver on the original promise of CBC Casper but was brought to market quickly. By going with "Plan B," the Defendants demonstrate how they were always more interested in branding and rushing to market than in substantively delivering the actual CBC Casper (including

---

[5] This included their abandonment of "sharding," which is another feature described in the original CBC Casper paper.

failing to meet the standards of performance emphasized in the original CBC Casper paper).

**F.  The Defendants' Fraudulent, Bad Faith Negotiations and Violation of the Licensing Agreement**

59.     On the same day as the Research Agreement, February 14, 2019, CoorTech entered into a Licensing Agreement with CasperLabs. The Licensing Agreement consisted of two parts: (1) granting CasperLabs limited rights to use Mr. Zamfir's name and image and the terms and conditions by which they could use those rights as well as (2) paid personal appearances (referred to by the Defendants and CoorTech as the "Sponsorship Agreement"). In the "Sponsorship Agreement," CasperLabs agreed to provide fundraising services and to source and close donations from third parties, in exchange for Mr. Zamfir's personal appearance at events free of charge. The parties had so agreed because these funds were required to complete Mr. Zamfir's research and its verification so as to enable the successful launch of a fully-compliant Casper network. As discussed in further detail below, the Defendants declined to spend the time and money to launch a fully-compliant Casper network. Instead, never intending to honor the agreements, the Defendants used these agreements as pretexts to hijack the Casper brand and misrepresent to the public their actual commitment to the technology.

60.     Defendants immediately began a marketing campaign associating Mr. Zamfir's name and image in branding their company, well beyond the terms contemplated by the Licensing Agreement. Even before the actual signing of the contract, press releases, interviews, and other media coverage were released without CoorTech approval. *See, e.g.*, Ex. 3. This misleading practice continued during and after the term of the contract.

61.     Although Defendant Walker repeatedly informed Mr. Zamfir of sponsors supposedly interested in supporting his Casper research, no funds ever materialized.

62.     In or about August 2019, Defendant Varun Gupta told CoorTech that Defendant Scott Walker stated to him that the CasperLabs' Sponsorship Agreement was never going to be honored.

63.     Based upon Defendants false and misleading misrepresentations, on September 11, 2019, CoorTech sent notice to the Defendants that it was terminating the License Agreement.

64.     As shown by the foregoing, Defendants fraudulently acquired CoorTech's agreement to the Licensing Agreement, while never intending to honor its terms, solely to hijack the brand and technology. These misdeeds were later used in the schemes discussed below to realize fraudulent profits for their personal gain.

**G. The Defendants' Fraudulent, Bad Faith Negotiations and Violation of the Trademark Assignment Agreement**

65.     On or around March 27, 2019, CasperLabs informed CoorTech of its intention to use the mark "Casper" to name its currency and network. CoorTech objected and continued to object whenever the subject came up. The Defendants ignored both law and agreements to hijack the "Casper" name for their schemes. In this, the Defendants demonstrated that they were always more interested in branding and deceiving the public than they were on delivering the technology.

66.     Although CasperLabs continued to pursue this objective, on or around April 12, 2019, Defendant Scott Walker agreed to "not to use 'casper' for their blockchain."

67.     On July 10, 2019, Defendants agreed that CasperLabs would "register the 'Casper' trademark in Coortech's name so [Mr. Zamfir] can control it …" *See* Ex. 4; *see also* Ex. 5. As with Defendant Walker earlier, the Defendants were lying.

68.     On August 20, 2019, Defendant Gupta informed CoorTech's representative that he had no knowledge of the status of the Casper trademark

registration and its assignment to CoorTech and that they should speak with then-board member Steven Nerayoff. *See* Ex. 6.

69.     On or about September 4, 2019, the Executive Defendants and Cayman Board Defendants filed multiple trademark applications for the name "Casper." Despite the various agreements in place, including express written promises to CoorTech, the Executive Defendants and Cayman Board Defendants did not inform CoorTech of this action.

70.     On or about November 17, 2019, CasperLabs received notification from the USPTO that they were awarded the "Casper" trademark. The Defendants never informed CoorTech.

71.     On November 23, 2019, six days after receiving notification from the USPTO, Defendants Walker, Manohar, and Sarkin rescinded all pending agreements. *See* Ex. 7.

72.     The Defendants, led by the Executive Defendants, Scott Walker, and Brock Pierce, always intended to hijack the technology, the Casper name, and Mr. Zamfir's likeness to support the schemes described below. The Defendants' breach of fiduciary duties was not confined to its bad faith and misleading hijacking of the Casper brand.

**H. The Alchemist Insider Transaction**

73.     On April 30, 2019, Alchemist Accelerator LLC ("Alchemist"), a company controlled by Defendant Walker and Mr. Steven Nerayoff, entered into an agreement with CasperLabs (then known as "Adaptive Holdings").  Both Messrs. Walker and Nerayoff were CasperLabs Board members at the time of the transaction. The agreement called for Alchemist to transfer to Adaptive Holdings Ltd. 1/3 of its 6% equity interest in the TechStars Alchemist Blockchain Cohort Series 2019 (the,

"Techstars 2019 Deal") for a consideration of $1,266,000. *See* Ex. 8. Defendant Manohar signed the Techstars 2019 Deal on behalf of CasperLabs.

74.     On July 26, 2019, Defendant Manohar and Steven Nerayoff entered into the Alchemist Adaptive Techstars Cohort Series 2020 Interim Agreement (the "Techstars 2020 Deal"), which again obligated CasperLabs to make an initial payment, this time, for $900,000 at the same conditions as the Techstars 2019 Deal. *See* Ex. 9.

75.     The Techstars 2019 Deal was always fundamentally flawed. Alchemist acquired its 6% stake by paying $200,000 and signing a $1,000,000 convertible note because it had no way of funding this obligation. Instead, Defendant Walker and Nerayoff intended to have CasperLabs assume this liability out of its Series A funding round. The extra $66,000 paid for no reason other than to funnel money out of CasperLabs.

76.     On or about October 8, 2019, Techstars cancelled its partnership with Alchemist, thereby ending even the theoretical value of either Techstars deal. *See* Ex.10.

77.     The Executive Defendants, Brock Pierce, and the Cayman Director Defendants agreed to both the Techstars 2019 Deal and Techstars 2020 Deal even though they knew that: (1) a 1/3 interest in the TechStars 2019 Deal was not worth $1.266 million; (2) the Techstars 2020 Deal was not worth investing in and proceeded to lose $900,000; (3) that the loss of that cash would negatively impact CasperLabs' ability to develop the CBC Casper technology; (4) that it may result in a payment of an undisclosed amount to two board members; and (5) the deal was never properly disclosed to Series A investors while soliciting their investment or to existing shareholders.

78.     Through all of these actions, the Executive Defendants, Brock Pierce, and the Cayman Director Defendants violated their fiduciary duties of care and loyalty.

## I. The Continued Extortion of CasperLabs

79.     At or about the same time as the Techstars 2020 Deal, Defendants Gupta and Parlikar reached out to CoorTech in order to to request that Mr. Zamfir intervene in how CasperLabs was being managed.

80.     During an emergency meeting in Los Angeles with Gupta and Parlikar, CoorTech's representatives were informed that Defendant Walker and Mr. Steven Nerayoff demand for 7% of all CasperLabs coins to be paid to a legal entity that they had set up. Defendant Walker and Mr. Steven Nerayoff later rounded the demand amount up to 10% to cover their taxes.

81.     Upon information and belief, Defendant Scott Walker and Mr. Nerayoff made it clear that they would interfere with upcoming Validator sales and future funding rounds if they did not comply with their extortionate demands.

82.     Defendants Medha Parlikar and Varun Gupta told CoorTech representatives that they could control Defendant Walker and reduce the chance of future extortion and fraud if they removed Nerayoff from the CasperLabs Board. CoorTech informed Medha Parlikar and Varun Gupta that both Defendant Scott Walker and Nerayoff had to be removed to ensure the ongoing viability of CasperLabs. Defendants Parlikar and Gupta disagreed but also asked CoorTech to persuade Brock Pierce to use his controlling shares to vote for Nerayoff's removal. Although Nerayoff was removed from the Board, these cosmetic changes had no positive effect.

83.     In September 2019, Nerayoff was arrested and ultimately indicted by a Grand Jury in the Eastern District of New York for extortion. *See* Ex. 11.  In that matter, as here, parties threatened to disrupt a blockchain company's funding unless the company used its seed money to purchase a worthless interest in one of their companies. *See* Ex. 12.

84.     According to Defendant Gupta, Defendant Walker managed to get Manohar and Parlikar "in line" by buying them off. Instead of Defendant Walker and

1   Mr. Nerayoff splitting the 7% in token amongst themselves it would be split evenly

2   four ways among Defendant Walker, Defendant Parlikar, Defendant Monahar, and

3   Nerayoff.[6]

4        85.    In the various funding rounds (Series A, validator token, and Coinlist

5   CSPR token sale, etc.) that followed the Techstar deals, the Executive Defendants,

6   Brock Pierce, the Cayman Board Defendants, and the Swiss Board Defendants did

7   not disclose this transaction or the other insider distributions.  Indeed, the chart that

8   the Executive Defendants, Brock Pierce, Cayman Board Defendants, and the Swiss

9   Board Defendants distributed in connection with Coinlist CSPR coin sale only lists

10  that 8% of the coins are going to the "Team." Upon information and belief, the

11  "Team" coins are among the first to become freely tradeable.

12  **J.  The Defendants Rebrand CLX as CSPR and Try to Conceal Their Failure
       to Develop the CBC Casper Technology**

13

14       86.    Throughout the duration of the License Agreement and the Research

15  Agreement, CasperLabs did not have a name for its coin, protocol or network.  The

16  Defendants, on several occasions, asked for Mr. Zamfir's permission to use the name

17  "Casper" for the CasperLabs coin, protocol or network, but CoorTech and Mr.

18  Zamfir refused to give consent.

19       87.    CoorTech made it clear to the Defendants that the "Casper" name

20  should not be used to describe any of CasperLabs' planned blockchain releases that

21  were developed as a result of the collaboration, but instead should be used

22  technically to refer only to his PoS consensus protocol research.  For example, when

23  Mr. Zamfir objected to calling the token "Casper," CasperLabs used "CLX" as a

24

25

26  _____

27  [6] Upon information and belief, there was actually even a third undisclosed
    Techstars/Alchemist transaction that funneled approximately $900,000 additional
    dollars to insiders such as Defendant Scott Walker. With that third transaction, more
28  than $3 million was looted from the company.

placeholder for the name of the token, with ongoing discussions about a new name. However, the Defendants still had plans to hijack the "Casper" name for their coin.

88.     By August 2020, in anticipation of the token sale scheduled for March 23, 2021, the Executive Defendants, Brock Pierce, Cayman Board Defendants, and Swiss Board Defendants began referring to the CasperLabs blockchain protocol and token as "Casper."

89.     As part of its strategic, wholesale rebranding in August 2020, CasperLabs also developed a webpage designated to the network itself, using "Casper" logos and the acronym "CSPR" to refer what is offered for sale. *See* Ex. 13.

90.     On or about January 12, 2021, Defendant Medha Parlikar announced the "Casper Network Highway Consensus Protocol" ("Casper Network Highway"). *See* Ex. 14. This included the "Plan B" liveness component that Defendants decided to roll out.

91.     On or about February 23, 2021, CasperLabs renamed their Telegram channel as "Casper." The Telegram channel is one the Defendants primary platforms for communication with the public.

92.     Although they misleadingly placed the name "Casper" on the protocol, the "Casper Network Highway Consensus Protocol" did not provide the functionality necessary to unlock the promise of the CBC Casper PoS protocol. Among other failures, the "Casper Network Highway Consensus Protocol has too high overhead to support large numbers of validators, something that has always been emphasized in CBC Casper research, and additional technical failures further decrease the performance of CasperLabs' product. The "Casper Network Highway Consensus Protocol" never met Mr. Zamfir's technical standards and the public expectations for CBC Casper. The Defendants knew about these shortfalls but chose to push forward

anyway in the hope that the association with Mr. Zamfir's past work would be enough to support their various schemes and to mislead the public.

93. As March 23, 2021 approached, CasperLabs increased its efforts at rebranding its project by misleadingly using the "Casper" name, either alone or in combination with other terms, such as "Casper network," "Casper protocol," "Casper Network Highway Consensus Protocol," and "Casper blockchain."

94. In support of these promotion efforts, the Executive Defendants, Brock Pierce, and Swiss Board Defendants paid persons and entities on YouTube and elsewhere to promote the purported merits of the CasperLabs coins. These promoters rarely revealed that they were paid endorsers of CasperLabs.

95. Investors, fellow researchers and developers within the Ethereum community and global blockchain industry recognize the Casper name and associate it with the high-quality design of Mr. Zamfir's CBC Casper protocol. *See* Ex. 15. CasperLabs' customers and investors therefore purchase goods, services, commodities and securities based upon false and misleading statements by the Defendants.

96. Even the CasperLabs team recognized that using the Casper name to refer to the CasperLabs blockchain technology would create confusion with Mr. Zamfir's prior work. For instance, in a February 18, 2019, Telegram message discussing use of the Casper name, a member of the CasperLabs team noted that using "Casper for the name of the protocol seems like it will lead to confusion or at least be hard to explain in the long run." Another team member responded "I agree, the name carries so much significance today. Vlad is the POS architect after all." *See* Ex. 16.

97. Because they could not develop their own transformative technology, the Defendants were counting on this confusion.

98.     Despite these weaknesses, the Executive Defendants, Brock Pierce, and Swiss Board Defendants plowed forward with the Coinlist token sales.

**K. Casperlabs' 2021 Coinlist Token Sales**

99.     On March 23, 2021, CasperLabs launched its token sale of the CSPR coin on CoinList. The Casper Network Mainnet subsequently launched on or about March 31, 2021 (the "Mainnet").

100.     Public records indicate that CasperLabs engaged in four rounds of coin offerings in March and April of 2021, which were called Option 1, Option 2, Option 3, and (eventually) Option 4.  *See* Ex. 17; Ex. 18. These rounds were offered via California-based Coinlist, a cryptocurrency trading platform.

101.     Initially, Coinlist was selling 10% of the 10 billion CSPR to be issued on March 10, 2019, and, again on April 1, 2019, this was increased by 7%, to 17%. *See* Ex. 17; Ex. 18.

|  | Coinlist v.1 | | | Coinlist v. 2 | |
|---|---|---|---|---|---|
|  | CSPR Coins | % |  | CSPR Coins | % |
| CasperLabs Holdings AG | 1,000,000,000 | 10.0% |  | 1,000,000,000 | 10.0% |
| Team | 800,000,000 | 8.0% |  | 800,000,000 | 8.0% |
| Advisors | 600,000,000 | 6.0% |  | 600,000,000 | 6.0% |
| Coinlist | 1,000,000,000 | 10.0% |  | 1,700,000,000 | 17.0% |
| CasperLabs Association | 2,030,000,000 | 20.3% |  | 1,330,000,000 | 13.3% |
| Validator Sale 1 | 1,950,000,000 | 19.5% |  | 1,950,000,000 | 19.5% |
| Validator Sale 2 | 1,020,000,000 | 10.2% |  | 1,020,000,000 | 10.2% |
| Developer Incentives | 1,600,000,000 | 16.0% |  | 1,600,000,000 | 16.0% |
|  | 10,000,000,000 | 100.0% |  | 10,000,000,000 | 100.0% |
|  |  |  |  |  |  |
| CoinList Sale Option 1 | 400,000,000 |  |  | 800,000,000 |  |
| CoinList Sale Option 2 | 300,000,000 |  |  | 400,000,000 |  |
| CoinList Sale Option 3 | 300,000,000 |  |  | 400,000,000 |  |

| | | | | | |
|---|---|---|---|---|---|
| CoinList Sale Option 4 | 0 | | | 100,000,000 | |

102.   These Option 1 through 4 rounds eventually sold approximately 17% of the possible "Casper" coin supply, 1.7 billion CSPR coins. However, the Option 1 through 4 rounds were not freely tradeable. The 400,000,000 CSPR coins of Option 3 coins would be the first to be released on May 11, 2021. Option 2 coins would be tradeable after 6 months.  Options 1 and 4 would not be released for a year. *See* Ex. 19.

103.   Prior to Options 1 through 4, CasperLabs engaged in the following funding rounds and token sales: (1) a Founders Round for common stock closed in or around February 2019; (2) a Series A round for preferred stock closed in or around July 2019; (3) a validator sale for CLX tokens which could be converted into CSPR coins at the launch of CasperLabs' Mainnet, they were subject to a three month staking period after the Mainnet launch and a three-month unbonding period ("Round One"); (4) in or around May 2020, a Venture Round with Draper Goren Holm at undisclosed conditions; and (5) in or about October 2020, CasperLabs again sold CLX validator tokens that were subject to a three month staking period after the Mainnet launch and a three-month unbonding period ("Round Two").

104.   There may have been a $3 million sale of EVOs (Exchange Validator Offering) through BitMax.io, a Hong Kong exchange, and a similar $3 million sale through Hotbit, which is a Singapore-based exchange. *See, e.g.* Exs. 20, 21. Public statements from BitZ also suggest that the Defendants were also involved in the BitZ IOU tokens.

105.   The exchanges that bought the validator tokens received a premium of around 30% when those tokens were converted into CSPR coins. Once again, the purchasers of validator tokens are among the first who can freely trade CSPR coins.

106.   Some of the funders and validator token purchasers were based in the United States.[7]

107.   Between the initial funding rounds and the Coinlist CSPR coin sales the only financial instruments trading were the IOUs on BitZ, which were under the Defendants' control.

**L. Fraud, IOU Tokens, and the "Pump and Dump"**

108.   Shortly after the Coinlist CSPR coin sale, "Casper" "IOU tokens" began appearing on lightly traded exchanges, such as BitZ, a Hong Kong-based exchange. IOU tokens are not the actual coin but they represent a contractual right to the underlying coin once trading begins. These IOU tokens allow users to buy, sell, and hold the native token of a blockchain that has not yet gone live with its final public network, the Mainnet. Because the value of these IOU tokens are tied directly to the price of the underlying coin, similar to options and futures contracts, they can drive coin prices even before active trading is possible. In concert with this IOU trading, the Executive Defendants, Brock Pierce, and Swiss Board Defendants coordinated wide press discussion of the fact that the "Casper" coin, not the IOU, would be tradeable soon.

109.   Beginning on or about May 6, 2021, IOU token sales and the Executive Defendants, Brock Pierce, and Swiss Board Defendants' promotion campaign drove the price of the "Casper" coin, which was still untradeable, from approximately $1 to more than $20. Upon information and belief, IOU "Casper" token sales included sales from and to United States persons and entities.

110.   Price action for the token started to pick up on May 7, 2021, as trading volumes began to increase in anticipation of a May 9 announcement that CSPR would be listed on Huobi, the sixth-largest cryptocurrency exchange. *See* Ex. 22.

---

[7] As discussed in further detail below, each of these funding rounds gives the buyer a right to a certain number of CSPR coins once the Mainnet launched.

111.   In addition to the IOU tokens, upon information and belief Defendant Manohar and other United States citizen Defendants were soliciting clandestine CSPR coin token sales in or about April 2021.

112.   On or about May 9, 2021, cryptocurrency exchange Huobi Global announced that they would soon list the "Casper" coin for trading. Huobi Global announced no restrictions on CSPR trading starting on May 11, 2021.  *See* Ex. 23.

113.   Leading up to free trading on Huobi, investors and journalists noted that the IOU "Casper" tokens on BitZ appeared lightly traded and subject to manipulation.  *See* Ex. 24.

114.   BitZ also appeared to be inflating trading volume via "wash trades." *See* Ex. 25. Wash trading is a process whereby a trader buys and sells a security for the express purpose of feeding misleading information to the market. In some situations, wash trades are executed by a trader and a broker who are colluding with each other, and other times wash trades are executed by investors acting as both the buyer and the seller of the security. Wash trades constitute violations of United States laws and regulations.

115.   Due to the IOU token sales, the CSPR coin reached a price that was more than 2,000 times higher than it was listed during the Coinlist CSPR coin sales. This is particularly notable because none of the actual coins were available to trade during this period (March 2021 until May 2021). However, the price of the CSPR coin immediately plummeted on May 11, 2021, the date that the CSPR coin was made available for trading on several exchanges (e.g., Huobi Global, OKEx, BitZ, ZBG, and XT.COM). As of May 16, 2021, according to CoinMarketCap, the price for CSPR was less than a dollar, at just $0.583, and the market rank was #2537. The price of the "Casper" coins currently lists at less than $0.09.

116.   Approximately 590,000,000 "Casper" coins sold between May 11 and May 12, 2021. Despite the broad sell-off,  Executive Defendants, Brock Pierce, and Swiss Board Defendants dumped approximately 120,000,000 to 140,000,000

"Casper" coins onto the cooperating exchanges (Huobi Global, OKEx, BitZ, ZBG, and XT.COM), further driving down prices. *See* Ex. 26.

117.   Upon information and belief some of the sellers and buyers on these dates were based in the United States. The Defendants and their paid promoters also directly encouraged United States investors to buy CSPR coins. In addition, many of the validators for the transactions were based in the United States.

118.   Upon information and belief, the Executive Defendants, Brock Pierce, and Swiss Board Defendants coordinated this sell-off, by themselves and through their co-conspirators, after consolidating control of the tradable coins during the targeted period in early May 2021, while also pumping false and misleading information into the market, so that they could realize quick profits for themselves at the expense of the long-term health of CasperLabs and the individual stock price of other shareholders, like CoorTech.

119.   This practice of consolidating control of a pool of assets during a targeted period, fraudulently inflating the price of that asset through price manipulation on a lightly traded exchange, pumping misleading information toward sellers, and then leading a coordinated selloff of the asset to third-party investors in a short period is commonly referred to as a "pump and dump" scheme. These schemes constitute violations of the regulations and criminal laws governing the sale of assets.

**M. Fraudulent Coordination with "White Label" Exchanges Results in Fraud and Dilution**

120.   In the autumn of 2019, the Executive Defendants, Brock Pierce, and Cayman Board Defendants told CoorTech and its representatives that they were planning a "Validator Token Sale", CLX tokens, which they treat as financial instruments entitling the buyer to receive the network's native coin once the Mainnet goes live, eventually, the native coin was named "Casper" with the ticker symbol "CSPR". In a PoS network, only the native coin can be staked to provide the network with the economic security it requires to be safe. The CLX token was to be offered

only to cryptocurrency exchanges, who could be considered accredited investors; the exchanges would then create a secondary market by selling either CLX or CSPR on to retail investors.

121.   Around the same period, CasperLabs informed CoorTech that it had also negotiated "white label validator services" with a major exchange. Other exchanges that were interested in buying validator tokens but not running their own validator nodes would be able to use the servers of the white label provider in exchange for a fee. *See, e.g.*, Ex. 27 ("Staking provider :: Huobi pool::"). This "white label" arrangement gave investors the misleading impression of a decentralized, highly-secure validator network when, in actuality, concentrating validator power in the hands of the few. This "white label" therefore promised a secure, decentralized network while delivering a less secure network.

122.   The Defendants sought to pursue this "white label" concentration of validator control covertly even though it can reduce the effectiveness of the system. This concentration of validator control can also affect the trustworthiness of the system because it permits validators to exert undue control of the network and can incentivize other bad behavior.

123.   In order to incentivize exchanges to buy the CLX token, the Defendants promised exchanges a premium when CSPR (the native coin) was released. Based upon available information: the first set of CLX buyers received 1.4 billion token that they converted into 1.95 billion CSPR: and the second set of CLX buyers received 0.8 billion token which were later converted into 1.02 billion CSPR. These two CLX buyers therefore received over 39% and over 28% premiums, respectively. Equity, tokens, and coins all contribute to determining the market value of a network such as the CasperLabs product and these are items that are used interchangeably all similarly situated blockchain companies. Therefore, these premiums dilute the value

of shareholder equity. These premiums and the resulting dilution were not adequately disclosed to shareholders or investors.

124.   Similarly, at Mainnet launch (on or about March 31, 2021), in conjunction with the cooperating exchanges discussed above, CasperLabs injected a further 120 -140 million CSPR coins into the market. This CSPR injection was done to provide those staking their CSPR coins to secure the network with returns significantly above the networks stated inflation rate (the rate of validator rewards) of 8% p.a.  The adjusted inflation rate allowed cooperating exchanges to produce returns above 19% p.a.  *See* Ex. 28.This additional injection of CSPR coins further diluted the value of the network harming shareholders.

125.   A further incentive for exchanges was their ability to be the second – the first being the Option 3 CoinList buyers of 400 million CSPR 40 days after Mainnet – to sell their CSPR coins on the open market, 90 days after the Mainnet launch.

126.   Interestingly, the "Team" CSPR coins could be sold 91 days after Mainnet. *See* Ex. 29. This is 3 months before the option 2 CoinList buyers. In this manner, the "Team" and the cooperating exchanges could benefit from the higher rate of return, over 19%, before being the first to dump their coins on the market driving down the price and before the weaknesses in their implementation became apparent.

127.   The Executive Defendants, Brock Pierce, Cayman Board Defendants and Swiss Board Defendants knew that this coordination of validators would be unhealthy for an open and permissionless network that purported implement the CBC Casper protocol. However, the Executive Defendants, Brock Pierce, Cayman Board

Defendants and Swiss Board Defendants were more interested in marketing and branding, which gave them short-term personal profits, than in the technology.

### N. Fraudulent Coordination with "White Label" Exchanges Results in "Wash Trades" and Market Manipulation

128.   The process whereby someone buys and sells an asset for the express purpose of feeding misleading information to the market is called a "wash trade." In some situations, "wash trades" are executed by a trader and a broker who are cooperating with each other, and at other times "wash trades" are executed by investors acting as both the buyer and the seller of the security. By controlling both ends of a transaction, those involved in a "wash trade" can feed misleading information to the market about, inter alia, the price and trading volume of an asset. Wash trading is illegal under U.S. law and regulations.

129.   The economics of running a validator on the network are such that they are only profitable if the CSPR coins trade above a certain cost. For this reason, upon information and belief, after the May 11 sell-off, the Executive Defendants, Brock Pierce, and Swiss Board Defendants coordinated with the exchanges to conduct "wash trades" that artificially maintained the CSPR coin prices above the relevant threshold for a period of time. These "wash trades" were designed to trick investors.

130.   A healthy, growing open and permissionless blockchain would have a constantly changing but inexorably growing number of independent validators. However, the control of the CasperLabs' validators has remained the same, which is driven by the improper distribution of the validator token sales, the high protocol overhead of adding additional validators, the tight coordination with Executive Defendants, Brock Pierce, and Swiss Board Defendants, and the overall undesirability of the CasperLabs project as an actual open and permissionless blockchain technology.

131.   This level of fraudulent validator coordination and wash trades was only possible because the Defendants chose to solely sell the CSPR coins at exchanges

that were based in countries with more lax anti-money laundering and fraud laws. However, as described above, most of the Defendants and the holders of validator tokens were located in the United States.

**O. The Economic Consequences for Shareholders of Casperlabs' Decision to Develop an "Enterprise" Blockchain**

132.   As discussed earlier, decisions as to the openness of blockchain network can drastically affect the price of the coin on the network.[8] CasperLabs represented to CoorTech that it would use Vlad Zamfir's CBC Casper technology and governance design to create an open and permissionless network.

133.   For companies deploying enterprise blockchains, which are commonly closed, permissioned networks, the companies' value is tied to the number of clients who internally deploy the permissioned blockchain to streamline their processes. However, the profitability of open blockchain companies is tied to how broadly their technology is adopted, commonly known as the network effect or Metcalfe's law. For example, Ethereum's value comes from the breadth of its community while an enterprise blockchain, such as the one that Walmart uses to reduce the cost of supply chain management, derives its value from contracts with individual vendors and internal process cost savings.

134.   After CoorTech ended its Licensing and Research Agreements, the Defendants decided to pursue an enterprise blockchain business model. *See* Ex. 30 ("The First Blockchain Built for Enterprise Adoption"). However, rather than landing revenue-producing contracts, CasperLabs signed a series of contracts wherein either no income is coming in or CasperLabs actually pays them. For example, there are agreements with companies like Quest Global to develop supply chain solutions using permissioned and closed blockchain technology. *See*, *e.g.*, Ex. 31.

---

[8] The Binance Network Blockchain is a clone of the Ethereum network but the BNB coin is valued at 1/10th that of ETH.

135.   The Executive Defendants, Brock Pierce, and Swiss Board Defendants' pivot from an open permissionless network to a focus on enterprise adoption has drastically reduced the utility and therefore the value of those contracts - which is, as stated above, is either nil or a cost - can only be reflected in the enterprise value of the company but not in the underlying coin, resulting in a loss of value for shareholders and CSPR coin holders alike.

136.   As stated on Casperlabs' website, "Casper is heavily focused on enterprise adoption with MOU's signed with several notable enterprises." *See* Ex. 27. Their policy of communicating every Memorandum of Understanding to the press serves to give the CSPR coin holders the impression that many companies are building projects to be deployed on their network, thus supporting the price. However, MOUs are not binding agreements and it is not hard to imagine the valid ones are for closed enterprise edition networks have no legal or economic motivation to use CSPR tokens from the public network.

137.   On the CSPR blockchain explorer (https://www.cspr.live), one can see that the activity on the CasperLabs blockchain is essentially the validation of empty blocks. This "empty validation" means that, except for validator rewards and a few fees, there is effectively no economic activity actually taking place on the network. The vast majority, if not all, of the pricing activity comes from the exchanges. Instead, there are agreements with companies like Quest Global to develop supply chain solutions using permissioned and closed blockchain technology. Those agreements, however, provide little value for the limp CSPR network that Defendants have delivered.

138.   Moreover, rather than building a truly open blockchain environment, the Defendant Brock Pierce, Executive Defendants, and Swiss Board Defendants have formed partnerships that will allow China to deploy the "Casper" technology.  As Defendant Manohar announced in a February 11, 2021 interview, CasperLabs is

1  seeking "state-level endorsement" by China of this technology.  *See*

2  https://www.youtube.com/watch?v=T7tsJ_BlYGU (last viewed on July 19, 2021).

3      139.   To vindicate this enterprise approach rather than an open model, the

4  Executive Defendants, Brock Pierce, and Swiss Board Defendants' focus should have

5  been on the concentration of validators (discussed in further detail above), the

6  security of the network, and number of developers on the public blockchain to

7  promote a higher coin value over time. The Defendants did not do this. Instead, as a

8  result of poor tech decisions and rushing to market without developing the

9  technology, the Defendants were leaving the only viable option being permissioned

10  enterprise blockchains. Because of these blunders, they left the public blockchain

11  chain with a depressed value and they cultivated little desire from developers to build

12  on it.

13      140.   On and around July 9, 2021, the "Casper Network" had a market value

14  of approximately $70 million, more or less the value of the cash received through its

15  numerous funding rounds. In other words, no value was created for shareholders or

16  CSPR coin buyers. The damage to shareholders is clear. The intended beneficiaries

17  being the Defendants.

18  **P.  Casperlabs' Corporate Structure is a Vehicle For Fraud**

19      141.   CasperLabs Holdings AG , Adaptive Holdings Ltd., and CasperLabs

20  LLC ("(collectively, "CasperLabs"): (1) use their names interchangeably; (2) share

21  identical officers; (3) share identical boards; (4) share an accountant; (5) share bank

22  accounts; (6) share a website, where they refer to each other interchangeably; and (7)

23  no CasperLabs entity holds Board meetings in Switzerland, Wyoming, or the

24  Cayman Islands.

25      142.   The Defendants controlled Swiss and Cayman Island entities from the

26  United States.

27

28

143.   The Corporate structures only existed as a vehicle to commit fraud on the investing public, defraud shareholders, and attempt to impermissibly avoid United States regulatory scrutiny.

## DEMAND FUTILITY ALLEGATIONS

144.   Plaintiff repeats and re-alleges each and every allegation as if set forth in full herein.

145.   The Company's directors, which includes the Defendants, are incapable of disinterestedly and independently considering a pre-suit demand to take corrective action to remedy the injuries alleged in the Complaint.  Accordingly, a demand would be futile Under Wyoming law, § 17-29-902(a)(ii).

146.   The damage caused to the Company by Defendants' knowing false and misleading statements, including but not limited to the diminution in value caused by the "pump and dump" scheme that they executed, is acute and self-evident.

147.   As set forth above, Defendants placed the Company in a dire position. Their actions reduced the perceived viability of the CBC protocol and resulted in millions of dollars in lost value in the "Casper" coins in May 2021.

148.   Defendants caused this damage to the Company knowingly and willfully.

149.   As such, Defendants face substantial liability as a result of their conduct, which is the subject of this derivative action.

150.    Upon information and belief, this liability includes no less than $120,000,000, which represents a portion of the diminution of coin value during the May 2021 "pump and dump," damage to the company's ability to conduct ongoing business.

151.   CoorTech is different from the Coinlist token sale buyers and the other investors in CasperLabs because its shareholder interest was restricted and not easily tradable.  Therefore, CoorTech did not have the same opportunity to alter his ownership stake. Also, unlike other investors, CoorTech has an interest in the

intellectual property rights of the inventor of the CBC Casper protocol. Therefore, when the Defendants made false and misleading statements about Mr. Zamfir's involvement and the use of the CBC Casper protocol, CoorTech experienced the damages in a manner that was different from other investors.

152.   For these damages, the remedy is not best given directly to CasperLabs. The Licensing Agreement called for CoorTech to be paid approximately $1.5 million for each year that CasperLabs utilized Mr. Zamfir's work and likeness.  Between that licensing framework, penalties, and interest, the damage caused by those lies exceeds $10 million.  Because of the unique nature of CoorTech's injuries, the damages should include the damage to the value of the Casper brand.  Given how the "Casper" coin prices immediately tanked in May 2021, these losses should be in excess of $70,000,000. In addition to awarding damages, the Court should also award injunctive relief compelling Defendants to retract their false and misleading statements, as well as rebrand their products, ceasing to call their token or network "Casper" or "CSPR."

## DAMAGES TO CASPERLABS DUE TO THE DEFENDANTS' BREACH OF FIDUCIARY DUTIES

153.   CasperLabs and its shareholders also suffered distinct damages by virtue of Defendants breach of their fiduciary duties. The various frauds in which they participated have the potential to reduce the value of CasperLabs to essentially a fraction of its expected value. Given the past valuations of CasperLabs, such as the validator token sales the company was worth in excess of $70 million before the Coinlist sale.  Defendants extracted millions of dollars of value during and after the Coinlist token sales.  The fraud connected to those schemes caused at least an additional $50 million in damage to CasperLabs.

154.   In addition to awarding damages, the Court should also award injunctive relief compelling Defendants to take whatever additional steps that are necessary to

compensate the victims of their May 2021 "pump and dump" and other fraudulent schemes.

**COUNT 1**
**(BREACH OF FIDUCIARY DUTY TO SHAREHOLDER COORTECH**
**UNDER THE LAW OF WYOMING § 17-29-901 – DIRECT CLAIM)**

155. Plaintiff CoorTech repeats and re-alleges the allegations of Paragraphs 1-154 above, as if fully set forth herein.

156. Defendants Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring, at all relevant times were CasperLab's managers, directors, and controlling shareholder.

157. Wyoming law -  in Title 17 - Corporations, Partnerships and Associations, Chapter 29 - Wyoming Limited Liability Company Act, Article 4 - Relations Of Members To Each Other And To The Limited Liability Company Section 17-29-409 - provides that Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring owed an undivided and unselfish loyalty to CasperLabs and its shareholders. That duty requires Defendants to both protect the shareholders' interests but also to refrain from doing anything that would work injury to them. The Defendants violated this duty by placing their own self-interest and greed above the interests of the Company during the various false and misleading statements that they made.

158. Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring violated those fiduciary duties by making false and misleading statements to the public about: (1) Mr. Zamfir's

involvement in the CasperLabs LLC technology; (2) their implementation of the CBC Casper protocols and technology (failing to meet the standards of performance emphasized in the original CBC Casper paper); and (3) the association of the "Casper" name with their technology.

159.   CoorTech was different from the Coinlist token sale buyers and the other investors in CasperLabs because its shareholder interest was restricted and not easily tradable.  Therefore, CoorTech did not have the same opportunity to alter its ownership stake. Also, unlike other investors, CoorTech was created to promote and protect the invention of the CBC Casper protocol. Therefore, when the Defendants made false and misleading statements about Mr. Zamfir's involvement and the use of the CBC Casper protocol, CoorTech experienced the damages in a manner that was different from other investors and in a manner that the remedy is not best given directly to CasperLabs.

160.   Because of the unique nature of CoorTech's injuries, the damages should include the diminution of the "Casper" coin prices in May 2021, which should be in excess of $70,000,000, and the damage to Vlad Zamfir's own reputation. In addition to awarding damages, the Court should also award injunctive relief compelling Defendants to retract their false and misleading statements, rename their products, and take whatever additional steps that are necessary to compensate the victims of their May 2021 "pump and dump."

161.   Plaintiff CoorTech has no adequate remedy at law.

**COUNT 2**
**(BREACH OF FIDUCIARY DUTY TO CASPERLABS UNDER THE LAW OF WYOMING § 17-29-902 – DERIVATIVE CLAIM)**

162.   Plaintiff CoorTech repeats and re-alleges the allegations of Paragraphs 1-161 above, as if fully set forth herein.

163.   Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring at all relevant times were CasperLab's managers, controlling directors, and controlling shareholders.

164.   Wyoming law, under which CasperLabs is governed, in Title 17 - Corporations, Partnerships and Associations, Chapter 29 - Wyoming Limited Liability Company Act, Article 4 - Relations Of Members To Each Other And To The Limited Liability Company, Section 17-29-409 provides that Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick Storchenegger, Sean Inggs, and Christopher Bowring owed an undivided and unselfish loyalty to Noble Talents not only affirmatively to protect its interests but also to refrain from doing anything that may injure the Company. The Defendants violated this duty by placing their own self-interest and greed above the interests of the Company.

165.   Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Daniel Marfurt, Sean Ingg, and Christopher Bowring violated those fiduciary duties by approving the acquisition of Alchemist Accelerator LLC stock for more than $2 million despite knowing that the transaction was merely a way to funnel more investment money directly to insiders.

166.   Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard

Murray, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, and Patrick Storchenegger violated those fiduciary duties by:

    a.  mismanaging the "Casper network" development to result in an substandard product (including failing to meet the standards of performance emphasized in the original CBC Casper paper) and maximize their short-term personal gains at the expense of the company's long-term health;

    b.  that in or about May 2021, the defendants engaged in a coordinated promotion and sell-off of "Casper" coins, among themselves and others acting at their direction, without notice to other CasperLabs LLC shareholders and securities holders, a fraudulent act that violated Securities and Exchange Commission rules (under the authority granted by the Securities Exchange Act of 1934) and the federal fraud statutes; and

    c.  beginning in or about May 2021, the Defendants knowingly participated in a fraudulent scheme to artificially inflate and maintain the price of the CasperLabs coins to maintain undisclosed profits earned by participating exchanges, a fraudulent scheme that violated Securities and Exchange Commission rules (under the authority granted by the Securities Exchange Act of 1934) and the federal fraud statutes.

167.   These fraudulent schemes caused damage to CasperLabs in excess of $50,000,000.

168.   Plaintiff and the Company have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

A.    That Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Clifford Sarkin, Varun Gupta, Terren Peizer, Jack Lynch, Joseph Richard Murray, Scott Walker, Daniel Marfurt, Matti Tapani Liukas, Ralpf Kubli, Patrick

Storchenegger, Sean Inggs, and Christopher Bowring made false and misleading statements Defendants violated their fiduciary duties by making false and misleading statements to the public about:

     i.    Mr. Zamfir's involvement in the CasperLabs LLC technology;

    ii.    Defendants' implementation of the CBC Casper protocols and technology; and

   iii.    Defendants' association of the "Casper" name with their technology.

    B.    That Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Varun Gupta, Clifford Sarkin, Jack Lynch, Joseph Richard Murray, Daniel Marfurt, Terren Peizer, Sean Ingg, and Christopher Bowring violated their fiduciary duties through approving the acquisition of Alchemist Accelerator LLC stock for more than $2 million despite knowing that the transaction was merely a way to funnel more investment money directly to insiders.

    C.    Defendants Brock Pierce, Scott Walker, Mrinal Manohar, Medha Parlikar, Varun Gupta, Clifford Sarkin, Jack Lynch, Joseph Richard Murray, Daniel Marfurt, Brock Pierce, Terren Peizer, Matti Tapani Liukas, Ralpf Kubli and Patrick Storchenegger violated their fiduciary duties through:

     i.    mismanaging the "Casper network" development to result in an substandard product and maximize their short-term personal gains at the expense of the company's long-term health;

    ii.    that in or about May 2021, the defendants engaged in a coordinated promotion and sell-off of "Casper" coins, among themselves and others acting at their direction,  without notice to other CasperLabs LLC shareholders and securities holders, a fraudulent act that violated Securities and Exchange Commission rules (under the

1                  authority granted by the Securities Exchange Act of 1934) and the

2                  federal fraud statutes; and

3        iii.    beginning in or about May 2021, the Defendants knowingly

4                  participated in a fraudulent scheme to artificially inflate and maintain

5                  the price of the CasperLabs coins to maintain undisclosed profits

6                  earned by participating exchanges, a fraudulent scheme that violated

7                  Securities and Exchange Commission rules (under the authority

8                  granted by the Securities Exchange Act of 1934) and the federal

9                  fraud statutes.

10      D.    Awarding Plaintiff damages for the claims for violation of fiduciary

11 duty;

12      E.    Awarding Plaintiff interest, including prejudgment and post-judgment

13 interest, on the foregoing sums.

14      F.    Awarding such other and further relief as the Court deems just and

15 proper.

**JURY DEMAND**

16          Plaintiff demands a trial by jury.

17

18 Dated: July 19, 2021          By: */s/ Christopher Ott*

19                            Christopher Ott (CA Bar No. 235659)

20                            16501 Los Barbos
                           Rancho Santa Fe, CA 592067

21                            ROTHWELL, FIGG, ERNST &
                           MANBECK, P.C.

22                            607 14th Street, NW; Suite 800

23                            Washington, DC  20005
                           202-783-6040

24                            cott@rothwellfigg.com

25

26                            *Attorneys for Plaintiff*
                           *Coordinated Technology Ltd.*

27

28

41
COMPLAINT

**<u>Rule 23.1 Verification</u>**

I, Vlad Zamfir, represent COORDINATION TECHNOLOGY LTD ("CoorTech"), the named Plaintiff to this action. CoorTech has been a shareholder of CasperLabs Holdings AG and Adaptive Holdings Ltd., of which CasperLabs LLC is a wholly-owned subsidiary (collectively, "CasperLabs") throughout the Relevant Period and approve the filing of this Complaint. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and affirm that the matters stated therein about which I have personal knowledge are true, and that the other matters stated therein are true and accurate to the best of my knowledge, information and belief, based in part upon the investigation conducted by counsel. Having reviewed it with my counsel, I hereby authorize its filing.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Vlad Zamfir, on Behalf of Coordination Technology Ltd.
July 19, 2021